4-10-0-8-0-0 for the appellant, Mr. Giacoletto, is that the right pronunciation, and for the appellee, Mr. Blood. You may proceed. May it please the Court, Mr. Counsel. I'm Steve Giacoletto and I represent the appellant, Kim Jenson. Through all of my years of reading to hear what appellate court justice is like, they often speak of brevity, and I assure you that will be one of mine today here. Nothing like a good family law case to end up the day, I guess. This appeal, I think, can be as simple or as complex as you want it to be, and I, of course, then would go for the simple, and as simply stated in my brief here, to me, this is just one issue here with regard to the property division. I have no intention, did not write it, and do not today intend to get mired down in the details of this case in the Court of Courts division, and I hope the Court would appreciate that. The question today is, how could it be equitable, in this case, when the parties' largest piece of property, their largest asset, was not valued? Now, having said that, I then turn around, and I am about to refer to part of that property division. On page 10 in my brief, I just laid out a summary of what the court did, and it appears that the lower judge was trying to make an equitable division, almost down the line here. He had the house, which was a big piece of asset, and he split that up, even had one party having to buy out the other. He did the same thing with the IRAs, for instance. They didn't balance out. He had one party balancing out, Randy Jensen balancing out to Kim, you know, the automobiles are automobiles, but for the most part, everything else, he did try and balance, at least make it equitable, except when you get down to that Lambert stock, or Lambert subservice consultant stock, which he pretty much didn't do anything with, and he just gave it to one party, plus another $10,000 to Randy. As I said, the court was trying to be equitable, but when you have that one big asset stand out, it's going to one party, it having no value assigned to it, I think that goes a long way. You know, I'm always amazed when somebody comes to the appellate court and says, Judge, the trial court didn't have any evidence, well, why didn't you present evidence? Yeah, you know, and that's the elephant's hand in the room, too, on this. You know, to the answer to that is, it's really up to the attorneys and the judge. The parties don't know any better, realistically, of course, and it's up to the attorneys to bring forth that evidence, and to me, though, they're the initial gatekeepers to do it, but the final gatekeeper, and whose decision is really being appealed in this, it is the judge's decision. And to me, he's the guy that's got to say, folks, get me something on this, get me an appraisal, get me an economist, okay, it's a bad economy, you don't want to spend the money, we need to stipulate to it. He's the final gatekeeper on his decision, and what needs to be brought before him, and so, you know, to my argument on that is, yes, attorneys should do it, but I think that's the message that needs to be sent out, ultimately, here, is that it's not really just the attorney's obligation, but at the end of the day, it's the judge's obligation. I've just got to send a message to this attorney through an opinion here today, saying, folks, you've got to have big assets here, I know you don't have to have specific values, but you've got to have something, something for the judge, if not, you know, by expert testimony, then you've got to at least stipulate to these big ticket items that are going to make the difference in the equity. Wasn't there evidence that this business was basically a personal service business, that it's not the kind of thing you could sell, his personal activities were the valuable part of the business? No doubt he was an important, he being Randy Jensen, was an integral part of the business, and to say it's something that you normally don't sell, I would say, well, normally not, except that he did buy that business, you know, years ago when it was at a lesser value, so it was something that he was able to buy right before they were married, and so I would say, perhaps, no, it is something that can be bought and sold, because that's how he acquired it. I was calling it a big ticket item, you know, there was some evidence in there about retained earnings in the tax returns, rather large ones, up into the upper hundreds of thousands of dollars, no evidence, of course, of what a retained earning is, but, you know, for the people that are accountants, it's basically your income over expenses and profit that has not been distributed to the shareholders. High receivables in the company, sometimes in the upper 200,000s, goodwill is always an issue here, but, you know, when he bought it, very little goodwill was paid, I don't know if this is a goodwill case or not, I mean, to me, that kind of reinforces my point, is this a goodwill case, should it have been considered in the context of goodwill? In the lower court, it just wasn't looked at it that way. You know, there was an $86,000 checking account as of December 15, 2007, that was part of the evidence, that was a high point of a checking account, at least in the evidence. When I bring up those points, it's not to say, oh, there's a value of the company, there's not, it's really to show that you just don't know. Perhaps there is significant assets here that does have some significant value to it, and that was my point of the brief, is if anything it leads to confusement. It's not about maintenance, I know there was some allusion to in my claim in an error in counsel's well-argued rebuttal of that, but, to me, I'm not looking to redo the maintenance here, I don't think, as I put in the brief, and you know the law better than I do, you can't substitute the maintenance for the property division, but it was to me suggested in the lower court's order that maybe that's what he did, maybe he made up for maintenance and increased maintenance and had high maintenance in lieu of the property, I don't know. But I only raise that point that, you know, I'm not looking to redo the maintenance or increase it or have a big value, that's exactly what I'm trying to get away from, but I don't think there's a proper balance there. That's all I have, gentlemen. Questions? I think not. Thank you. Thank you. Mr. Boyle? Thank you, Your Honor, and I'd like to thank the court for moving this argument to last. I had an argument this morning at St. Louis, and this is, you know, a fun day for me, and I appreciate the court making that possible. May it please the court, counsel. This is a one-man business, Justice Cook, you're right. Randy's got a truck, and he finds underground utilities, that's his business, and when he bought the business, he paid for the truck, he paid for some locators, the things that I guess, I don't know how to do it, I guess they beep when you're near something underground. So he's got the truck, he's got the locators, and he paid a lot of money for a covenant not to compete from the man he bought it from. And Randy's the business. He runs it out of his house, there's no building. When Randy goes to the store, the company's at the store. When Randy's in church, the company's in church. Wherever Randy is, that's the company. It's a one-man operation. That being said, I disagree completely with the assertion that there's no evidence of the value of the company. I think that all the major elements are mentioned on the record. And there are four, according to the Feldman case, that we both talked about in our briefs. The first one is fixed assets. And Randy said, the fixed assets is my truck that's not worth what I paid for it, and my locators, they're $3,000 or $4,000 each, and the bank account. And he said it was $47,000, I think he said at the time, it was 40-something. So that plus the locators, that's the fixed assets. That's the fixed assets of the company, which, as it turns out, if you look at everything else in the evidence, that's the value right there. I mean, if he had to sell what he had that day, I mean, the cash is the cash, and the locators is the locators, and that's it. Well, if you don't have any overhead, because you don't have a building, you've got a truck, the locators, you operate essentially out of your house, your spouse is, at least part of the time, was a bookkeeper for the business? I think it's bookkeeping, yes. When you generate gross receipts of $230,000 plus a year, what is it that's deducted from those receipts that's a cost of doing business? I mean, that sounds like a lot of money for a one-man operation, unless, I understand that the parties, I don't know whether they have a closely held corporation, or how this is set up, or if it's set up at all, but they're paying their own health insurance premiums, their car, their gas, their auto maintenance expenses, phone bills, car payments, etc. I don't know whether those end up being corporate tax deductions, or individual tax deductions, or not tax deductions at all, or whether they're declaring all their income. But at any rate, a business that has minimal fixed assets, that can generate this many receipts in a year, sounds like a valuable business. A good business. Well, it's a good business. That's provided them with a comfortable standard of living, I think. Yes, yes, he works very hard, apparently. I mean, he puts in a lot of hours. I mean, there's no other income of the business. It's just Randy out in the field. Well, then the receipts mean that he does that much business a year that he bills people. Yes, and he's that valuable. Well, what's the net on that? I'm not prepared to answer that, unfortunately. Well, other than taxes. Taxes? Sure. I guess insurance. Insurance, I suppose. Health insurance. There was some mention of cell phones being paid for through the company, vehicles probably through the company. His wife was listed as an employee of the company. Right. But there are alternated years where they took $130,000 plus in compensation. Correct. Was that, I guess, one year one takes it and one year the next? Does that have something to do with taxes? I assume it does. I graduated from the School of Business as an undergrad, but this is over my head. What accountants do, frankly, and what my accountant does in my personal case, I don't intend to understand. He just does what he thinks is best, and I hope that he's right and sign it in April. But, yes, things are going on that I do not understand, even as a business major. It's clear over my head. But still what it comes down to is there's just one business, and that's the man in the field. Accounts receivable. We have six years of tax returns and not one dollar in accounts receivable. He's a valuable man. Apparently they pay him. There's no bad debts. You don't see much of this as a lawyer who works on retainer, but I understand that when you have accounts receivable you also have bad debts because inevitably somebody doesn't pay up. And your accountant takes them off. There's no accounts receivable. There's no bad debts. And that's the second of the four elements. I mean, fixed assets, accounts receivable, bing, that's ours. Six years old. We got here, nothing. And what's the other two? Debts, well, he did testify that the debt was the truck and it wasn't worth what he owed on it. So he's upside down on the truck. If there's any more debts, it's not obvious what they'd be, and he certainly didn't say, under oath, I swear there's no more debts. But if you think about it, if the business is awarded to him and he's hiding a debt, who is he shooting in the foot? It's himself. What's the fourth item, goodwill? Goodwill. Isn't there some goodwill? Well, I'd submit under Zells and Talty, Supreme Court cases, there can't be because you can't sell it because the minute that he sells this business, it's gone. It's personal goodwill. Well, how about the fact that he had to get a covenant not to compete from the guy that sold it to him? If he were able to find somebody to buy the business,  I don't know. If I was going to buy the business from him, I'd want one. Yeah. Well, doesn't that indicate there's some goodwill there? Well, it's not the same thing, though, is it, Your Honor? I mean, goodwill is something that you can sell. Otherwise, it's not goodwill. Otherwise, it's personal goodwill. But a covenant not to compete, well, that's something unto itself. Maybe he has contacts and reputation and regular service to regular clients. That's all goodwill, isn't it? Yes, it is goodwill. But it's personal goodwill, Your Honor. Personal goodwill. Because if I get the truck, if I get his hard hat, and I show up at the job with the locator in my hand, and they go, well, who are you? And I go, I'm Dr. Blood. I'm with Lambert Underground Locators. I'm going to be back in the truck before I get my coffee drunk. They're not going to let me do that. It's got to be him. He's the man. It doesn't matter what he calls himself. He can call himself Bozo the Clown. He's still the man that can locate these things, and they know it. And, yes, it's repeat business, and they know him, and they expect Randy on the job. Well, say somebody came into town that was well qualified to do this kind of work and started up their own business. They'd have a hard time for a while. But if they bought the business from him, they'd be going full speed immediately. I couldn't do it. You couldn't do it. I couldn't do it. But somebody that had some ability could. Somebody that had some ability, yeah, but he'd probably be working somewhere else. I mean, that's how he'd get his ability. Well, why did your client pay for a covenant not to compete with that guy? If your client could have made the money anyway. He didn't pay a heck of a lot. It was like $25,000, which, at the rate this guy's working, it goes pretty quick. I don't want to change the subject, but I do have something else I'd like to point out, which is that he didn't exactly walk off with this whole business. The judgment says that she had borrowed $30,000 from the business and that she had taken, just taken, $37,000, $67,000. Now, part of the judgment was Judge Londrigan said, you don't have to pay back that $30,000, and of the $37,000 you just took, you only have to pay back $10,000. So it's not like he got everything. She did all right. I mean, she got a lot of other things, too. I want to correct counsel. It might not even be what he meant to say, but the court did not split it up. It did not divide the marital home or the retirement accounts. The parties agreed on that. There's agreed orders on this file. So by the time it got to the judge, there wasn't a whole lot to divide. There was business, of which she had her hands in $67,000 plus dollars and ended up with $57,000 of it, and that's all there was for him to divide. He ends up with the rest of the business account, but he's got to run the business. I mean, he's paying maintenance, too, and it's extendable maintenance, and it doesn't do her any more good than it does him to choke off the business with insufficient cash. That's an important point, I think. You've got to look at the judge as a whole. They have broken up a lot of the property themselves, but when you come right down to it, extendable maintenance. On this record, she's still on maintenance, and if she makes the case for it, which she wasn't looking for work, so maybe she can. I mean, how can you call it an unfair judgment? How can you call it inequitable, unjust, when there's extendable maintenance? Well, I think I've hit all four factors. I don't know if we have an agreement on it very well. I don't know.  Thank you, Your Honor. The client appreciates the hearing. We ask that the judgment be approved. Thank you. Just a couple of brief notes. Mr. Blood had alluded to the maintenance still being open, and I don't think that, you know, I think it's pretty explicit that maintenance should not be making up property division. The $30,000 loan, and I promised I wouldn't get mired in the details, but here I am. When you start reading the record, you really can't figure out what that is, because there's talks about there being a $30,000 loan that has to be repaid back, which is a bigger asset of the company, but then there's letters to the judge that said that he misinterpreted something and then he reduces it down to $10,000. Frankly, when you look at the records, I couldn't figure out what the $30,000 loan reduced down to $10,000 loan was really all about. Does your understanding there was the $30,000 loan and the $37,000 that she just took or withdrew for her own living expenses, maybe after they separated? You know, I get that from hearing him and hearing different versions from my client, but I don't get that out of the record when I try and glean it independently. You know, I get the party speak out of it, and to me it's not clear at all. You know what it boils down to, though, is you ask yourselves or your clerks or anyone in this room, after you've read the record, does anybody know what the value of that company is? Even really a rough idea within $30,000 or $40,000, and I alluded to there being some worthy asset here with retained earnings, the income flow, et cetera, et cetera, but if anybody could read through the record and really figure out, could you tell what this company is worth, I think rhetorically the answer is no. You really just don't know what this company is worth even in the ballpark figure, and I think that's the point of this problem with the error of the court, and we ask that it be remanded. Thank you, Counselor. We'll take this matter under advisement and stand in recess until tomorrow morning.